IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK RYAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 06-2385 |
| CBS CORPORATION and PHILADELPHIA TELEVISION STATION WPSG, INC., | : | |
| Defendants. | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                                                                         **AUGUST 7, 2007**

  Plaintiff Jack Ryan has filed suit against his former employer, Defendant CBS Corporation and Defendant Philadelphia Television Station WPSG, Inc., alleging age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Const. Stat. § 951, et seq.[1]  Presently before this Court is Defendants' Motion for Summary Judgment.  For the following reasons, this Motion is granted.

**I.  BACKGROUND**

  From 1988 to 2003, WPSG employed Jack Ryan as an advertising account executive. His primary employment responsibilities were the selling and placement of commercial advertising time for on-air broadcasts, including the broadcasts of local professional sporting events.  Ryan was one of the highest grossing salespersons for WPSG and frequently received

---

[1] "The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively." Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005).

praise for his efforts. At the time of his termination, Ryan managed one of WPSG's largest advertising accounts.

On March 31, 2003, Ryan was terminated from his employment at the age of 67. His termination arose out of two incidents that occurred on March 11, 2003 and the ensuing investigation. The first incident was between himself and Angie Clements, another WPSG account executive. The second incident occurred between Ryan and Bobbi White, an African American sales coordinator. These two incidents occurred at a WPSG reception for its clients to view plans for the new Philadelphia Phillies' ballpark (hereinafter "Phillies Event").

Ryan's and Clements' accounts of what occurred at the Phillies Event differ. Ryan's account is as follows. He spent time entertaining and socializing with clients and probably had two or three drinks while conversing. At one point in the night, he went outside to smoke a cigarette in the parking lot, which is an area that was not visible to those inside the Phillies Event. Clements approached him and asked him for a cigarette. He obliged. Ryan thought that Clements was drunk. Clements then asked him if he knew someone she could call to get cocaine, or if he could call someone for her. Ryan refused her request, told her to stay away from him, and began walking away from her. Clements then shoved him in the back, became hysterical, and asked him not to tell the managers that she asked for cocaine. He said he would not tell on her and then returned to the Phillies Event. Clements' account differs in many ways. She claims that while Ryan was drinking at the Phillies Event, he began berating her and accusing her of attempting to curry favor with Barbara Sredenschek, her manager and Ryan's immediate supervisor. She asked Ryan if they could talk about this outside rather than in the presence of clients. They left together. Once they were outside, Ryan continued to berate her, he

pushed her, and told her "I could have you killed."

In the second incident, Ryan asked Rich Salita, another account executive, for a ride home after the Phillies Event. Salita responded that he already promised to give a ride to Bobbi White. Ryan claims that he responded to Salita by jokingly saying that you would "rather give a beautiful black woman a ride than a poor white Irish guy." (Def.'s Mot. Summ. J., Ex. 1, Ryan Dep., 43:18-24). White, on the other hand, testified that Ryan said "Oh, you would rather ride back with that black chick as opposed to riding with me." (Id. at Ex. 9, White Dep., 22:16-18). White did not take offense to this comment and thought that Ryan was only joking. (Id. at 23:2-6).

Near the end of the Phillies Event, Kevin O'Kane, WPSG's General Manager, observed Clements crying while she spoke to Sredenschek. O'Kane, who was leaving town on business, asked Phillip Salas, the General Sales Manager, to find out what happened. Both Salas and Sredenschek met with Ryan and Clements to discuss the incident. Clements claimed that Ryan physically assaulted her, while Ryan claimed that Clements begged him to get her cocaine. An internal investigation into the incident ensued. Defendants' corporate human resources division in New York was contacted. Thereafter, on March 26, 2003, Robin Bona, Vice President of Human Resources, along with Mark Engstrom, Vice President and Associate General Counsel, visited the station to conduct a formal investigation.

They interviewed both Clements and Ryan, who told them their side of the story, as stated above. They then interviewed other WPSG employees who could have potentially corroborated either Ryan's or Clements' account. Unfortunately, no one was an eyewitness to the incident. They interviewed Bobbi White. She stated that she saw Ryan and Clements walk outside

together at the Phillies Event, but, after five or ten minutes they walked out of her view.  Thus, she did not witness any of the alleged incident.  White also recounted the incident about Ryan asking Salita for a ride home.  They interviewed Matthew Hendricks, another account executive, who Ryan claimed personally observed Clements using drugs.  Hendricks denied that he had seen Clements using drugs and denied telling Ryan that he observed her using drugs.  Ryan stated at his deposition that Hendricks was lying because Hendricks' father told him to not get involved in this incident.  Lastly, Bona and Engstrom interviewed Elaine Saqui, a sales assistant, who was responsible for greeting and checking-in guests near the front door at the Phillies Event.  She stated that from her location at the front door she saw Ryan and Clements standing together outside and they appeared to be talking, but that is all she witnessed.

 Ryan contends that Bona's and Engstrom's investigation was merely cursory.  They spent only one day at the station and chose only to interview people who may have seen the incident between Ryan and Clements.  They did not interview anyone who would have knowledge of Clements' character and history of drug use.  In response to this Motion, Ryan presented various other employees that he thinks should have been interviewed because they are intimately familiar with Clements' character and her drug problems.  ( See Ryan's Resp. to Mot. Summ. J., 16-20).

 At the end of the investigation, Bona and Engstrom concluded that Clements was more credible than Ryan, that it was more likely than not that Ryan assaulted Clements, that Ryan demonstrated dishonesty during the investigation, and that Ryan made a racially insensitive remark towards Bobbi White.  Bona testified at her deposition that Ryan's termination:

> was based on the seriousness of the allegations that were made against him, our belief that, based on our interviews, that everything pointed to the fact that they were true.  What he had been accused of on top of the other allegations that were

made against him, we felt that we had to remove him from our workplace.

(Def.'s Mot. Summ. J., Ex. 4, Bona Dep. at 93:5-93:12). She then testified that these other allegations that led to his termination were:

> [t]he comment of a racist or insensitive racist nature, his lying during – what we believed to be his lying during the investigation, his total disregard for Ms. Clements accusing her of things that were not substantiated. In fact, the allegation he made against her as using drugs was denied by the witness that he had put forth. All of those things. The physical part of the allegation was extremely severe in my view. And all of that, there were just so many policies that were violated, and I didn't believe there was any question that he had to be removed from the workplace.

(Id. at 93:14-94:4). When asked in his deposition how Ryan lied during the investigation, Engstrom responded:

> Well, first [it] had to do with his claim that he had a clean work record when we found that he, in fact, had a disciplinary warning in his file. Second, he said he had basically beaten the rap and the warning ceased to have effect. When I inquired into that, I was told that that wasn't true. The warning was never rescinded and remained a part of his personnel record. And then viewing the encounter between himself and Angie Clements on March 11 in '03, it seemed to me the facts supported Ms. Clements['] view and corroborated her and contradicted Mr. Ryan which would suggest that he wasn't telling the truth to me.

(Id., Ex. 12, Engstrom Dep. at 72:5-21). Bona and Engstrom reported these findings to Fredric Reynolds, then President and CEO of Viacom, and Martin Messinger, then Senior Vice President and Deputy General Counsel. A conference call amongst these individuals and O'Kane occurred and the decision to terminate Ryan was made. On March 31, 2003, O'Kane called Ryan into his office and terminated his employment. Ryan was offered a modest severance package in exchange for signing a release form.[2] Ryan declined to sign it. Instead, he brought this present

---

[2] Ryan points out that Viacom's Human Resources' Policy Manual states that an employee terminated for cause will not be granted a severance. (Def.'s Mot. Summ. J., Ex. 6, at WPSG 00246).

lawsuit.

      Ryan alleges various incidents of hostile and harassing treatment because of his age.

These incidents are:

- Barbara Sredenscheck asked him several times if he was going to retire and how long he was going to keep doing this work.

- Sales Manager Ross Reardon repeatedly made "old man" comments and jokes about him.

- Kevin O'Kane, early in his tenure at the station (mid to late 1990's), talked to Ryan about retiring and that he could get Ryan a nice settlement. O'Kane would also make "old man" jokes.

- In November 2000, Reardon and O'Kane made remarks about Ryan's age at a WPSG marketing event luncheon sponsored by the Philadelphia Ad Club. Reardon stated to a client attending the luncheon that she is going to have to cut up Ryan's food for him so that he can chew it. O'Kane responded that Ryan's food needed to be put in a blender.

- In 2001 or 2002, Ryan and his wife attended a WPSG sponsored event in the station's box seats at a Philadelphia Eagles' game. O'Kane was also present and told Ryan and his wife that they should sit in the back in case somebody important came in. O'Kane also asked Ryan if an older, overweight woman on the field was Ryan's "old girlfriend."

- In May 2000, Philip Salas sent an email memoranda to all the account executives stating, "My suggestion to each of you is to evaluate your future with WPSG. Please don't misinterpret my statement as a threat, which it clearly is not. I want each and every one on this team, if you are willing to step it up. We will have 2 brand new right out of college account executives starting with us in the next 2 weeks, and I can tell you that they are FIRED UP. I intend to keep them that way, so unless you are prepared to help me motivate them, mentor them, teach them and lead by example, then get out of my way." (Def.'s Mot. Summ. J., Ex. 1, Ex. 10 attached to Ryan's Dep.).

- Lastly, Ryan claims that some of his most lucrative advertising accounts were transferred to younger salespersons. The only evidence of these transfers occurred in 1996 and 1997.

6

Defendants do not dispute that these comments were made and that these incidents occurred.

Because of this age-disparaging treatment, Ryan contends that the investigation into the incidents at the Phillies Event was nothing more than "a witch hunt designed to fabricate a 'legitimate business reason'" and merely an attempt "to create an excuse for [Defendants'] intention to rid the workplace of an aging (albeit continuously effective) employee." (Ryan's Resp. to Mot. Summ. J., 40). Ryan argues that "any investigation properly performed and not engaged in to provide a pretextual excuse for an age-based termination would have revealed Ms. Clements' past conduct and raise serious concerns about her character and her bad habits." (Id. at 16). According to Ryan, the incident at the Phillies Event and the investigation thereof were nothing more than a cover-up of terminating Ryan because of his age.

Defendants have filed this present Motion for Summary Judgment arguing that Ryan's termination was legitimately based on his inappropriate behavior at the Phillies Event and there is no direct or indirect evidence of age discrimination, pretext, or a hostile work environment. For the following reasons, Defendants are correct.

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See also Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the

absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. The non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence showing that there is a genuine factual dispute requiring a trial. Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). A genuine factual dispute exists when "a reasonable jury could return a verdict in favor of the non-moving party." Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 817 (E.D. Pa. 2005). When a party fails to establish an element of their case, summary judgment must be granted. Celotex, 477 U.S. at 322.

### III.   DISCUSSION

The ADEA provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). The protections of the ADEA are limited to individuals at least 40 years of age. 29 U.S.C. § 631(a). Congress' goals in enacting this statute were "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems from the impact of age on employment." 29 U.S.C. § 621(b).

To prevail on an age-based termination claim, the plaintiff must show that his age actually motivated the employer and had a determinative influence on the decision to fire him. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000). "This showing that age

motivated or had a determinative influence on the decision of the employer can be made either through the use of direct evidence or circumstantial evidence." Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). To show age discrimination based on direct evidence, the plaintiff must satisfy the framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Id. To show age discrimination based on indirect evidence, the plaintiff must satisfy the three-step framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id.

### A.    Direct Evidence Analysis

Under Price Waterhouse, once the plaintiff has presented direct evidence of age discrimination, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have terminated the plaintiff even if it had not considered his age. Glanzman, 391 F.3d at 512. For evidence to be considered "direct" for the purposes of Price Waterhouse, it "must be sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age in reaching their decision." Id. "Such evidence 'leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it' when he made the challenged employment decision." Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002). Thus, the plaintiff's evidence of discriminatory attitudes about age must be "casually related to the decision to fire [him]." Glanzman, 391 F.3d at. 512.

In her concurrence in Price Waterhouse, Justice O'Connor provided guidance on the type of evidence needed to make out a direct evidence case:

> [S]tray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by

9

> nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard. . . . What is required is . . . direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

490 U.S. at 277 (O'Connor, J., concurring).  Accordingly, "[a]ge-related comments may qualify as direct evidence that an employment decision was made because of age when they unambiguously relate to age, relate to the employment decision in question, are made by either the person who made the personnel decision or someone who could influence the decisionmaker, and are not too remote in time from the making of the adverse employment decision." Barbara T. Lindeman & David D. Kadue, Age Discrimination in Employment Law 535-37 (2003).

Cases governed by Price Waterhouse (i.e., based on direct evidence) have also been given the moniker "mixed-motive." Fakete, 308 F.3d at 338 n.2.  Ryan contends that the evidence he presented can establish a "mixed-motive" case.  He, however, never contends that this evidence constitutes direct evidence.  This is because he argues, citing Costa v. Desert Palace, 539 U.S. 90 (2003), that a plaintiff need not produce direct evidence to establish a mixed-motive case.  Thus, Ryan implies that this Court should not apply the Price Waterhouse framework, but rather apply Desert Palace.

In Desert Palace, the question presented before the United States Supreme Court was "whether a plaintiff must present direct evidence of discrimination in order to obtain a mixed-motive instruction under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991."  539 U.S. at 92.  To resolve this question, the Court had to construe a 1991 amendment to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(m), which amended Title VII in response to the Price Waterhouse case.  Id. at 94.  42 U.S.C. § 2000e-2(m) provides that

"an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Construing this amendment, the Court found that because direct evidence is not required in mixed-motive cases, a plaintiff may be entitled to a mixed-motive jury instruction even when he or she has no direct evidence of discrimination. 539 U.S. at 101-02.

While cases analyzed under Price Waterhouse have been called "mixed-motive" cases, the Third Circuit has aptly recognized that "mixed-motive" is a misleading adjective because both indirect and direct evidence cases often involve a combination of legitimate and illegitimate motives. Fakete, 308 F.3d at 338 n.2. Accordingly, the Circuit's more recent cases "eschew the 'mixed-motives' label in favor of the more accurate 'direct evidence' description." Id.

Furthermore, Ryan's argument with respect to Desert Palace is incorrect because that case does not apply to ADEA claims. The Third Circuit has stated that the Civil Rights Act of 1991, only applies to Title VII, and not to the ADEA. Glanzman, 391 F.3d at 512 n.3. Thus, under Third Circuit precedent, when a plaintiff presents direct evidence of discrimination to show an ADEA claim, the Price Waterhouse framework still applies. Id.; see also Fakete, 308 F.3d at 337-340 (applying Price Waterhouse to ADEA claim based on direct evidence); Chubirka v. Int'l Paper/ XPEDX Paper & Graphics, No. 04-5010, 2005 WL 1840170, * 3 n.6 (E.D. Pa. Aug. 2, 2005) ("Desert Palace addresses statutorily-based, post-trial jury instructions in a Title VII case, and has not been extended to ADA or ADEA claims in the summary judgment context by the Third Circuit.").

Accordingly, this Court looks to Price Waterhouse. For the reasons explained below,

none of the evidence that Ryan presented constitutes direct evidence. First, the "old man" comments, by themselves, are simply stray remarks. Second, there is no indication in the factual record that Sredenschek, Reardon, or Salas were involved in the decision to terminate Ryan. Thus, their statements are those of nondecisionmakers and cannot be considered direct evidence. Third, O'Kane's comments at the Ad Club luncheon in 2000 and the "old girlfriend" comment at the Eagles game in 2001 or 2002, cannot be considered direct evidence. While O'Kane was a decisionmaker, his age-disparaging comments were temporally remote from the date of Ryan's termination and were thus unrelated to the decisional process of firing Ryan. In addition, O'Kane's comments and jokes could raise an inference of his bias, but these comments are too minor, indirect, and remote to logically lead this Court to a rational presumption that he acted on this bias. See Fakete, 308 F.3d at 338 (stating that evidence cannot just lead to logical inference of bias, but also must lead to a rational presumption that the bias was acted upon). Fourth, any statement by O'Kane and Sredenschek simply asking Ryan about when and whether he is going to retire is not direct evidence. See Glanzman, 391 F.3d at 513 (upholding district court's finding that simply asking plaintiff about her retirement plans is insufficient to be direct evidence). Fifth, Salas' email in 2000 seems to be nothing more than him trying to aggressively motivate his current sales force by explaining how the new hires are "fired up." Nevertheless, this email is temporally remote from Ryan's termination. Lastly, Ryan's allegations about the account transfers are also very temporally remote from his termination date as they occurred in 1996 and 1997. Therefore, there is no direct evidence of age discrimination.

    **B.**    **Indirect Evidence Analysis**

Where there is no direct evidence of age discrimination, the plaintiff may still prevail by

presenting indirect, circumstantial evidence under the burden shifting framework articulated in McDonnell Douglas. First, the plaintiff must establish a prima facie case of age discrimination by showing that he: "(1) is over 40; (2) is qualified for the position in question; (3) suffered an adverse employment decision; and (4) was replaced by a sufficiently younger person to permit an inference of age discrimination." Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995). By establishing a prima facie case, the plaintiff has created a rebuttable presumption of age discrimination. Id. The burden of production then shifts to the employer who must articulate a "legitimate nondiscriminatory reason" for the adverse employment decision. Id.; Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-55 (1981). If the employer carries this burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." Id. at 253; Brewer, 72 F.3d at 330.

    The question here is whether Ryan can show that Defendants' legitimate, nondiscriminatory reason for terminating Ryan, his inappropriate conduct at the Phillies Event, was merely a pretext for age discrimination.[3] For Ryan to defeat summary judgment on the question of pretext, he "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.

---

[3] For sake of this motion, this Court assumes that Ryan has established his prima facie case. Defendants only contest the fourth factor of the prima facie case. However, Ryan was replaced by younger account executives. The facts are just uncertain as to what specific individual replaced Ryan. (Def.'s Mot. Summ. J., Ex. 3, Salas Dep. 98:2-97:23).

1994); Logan v. Countrywide Home Loans, No. 04-5974, 2007 WL 879010, *5 (E.D. Pa. Mar. 15, 2007). While the analysis of pretext is whether the Defendants' proffered reason is the real reason for Ryan's termination, Ryan "retains the ultimate burden to persuade the trier of fact that the proffered reason is a pretext for discrimination." Id.

With respect to the first prong of the test for defeating summary judgment on pretext, Ryan contends that a factfinder could reasonably disbelieve Defendants' articulated legitimate reason. Ryan argues that the investigation was just a cover-up for firing him because of his age. The arguments he provides to show pretext are: (1) the investigation was flawed because Defendants did not fully investigate Clements' character and drug use problems; they did not fully investigate his positive character, focusing instead on his negative traits; and they only interviewed employees who could have witnessed the incident; (2) it was unusual for Engstrom to get directly involved in investigations; (3) the use of a release even though he was terminated for cause implies they were trying to cover up their actions; and (4) Defendants' relying on his alleged lying about his prior discipline and the remark he made to White, which she did not consider derogatory, were insufficient reasons for termination.

The evidence shows that Ryan was terminated because of his inappropriate conduct at the Phillies Event, and not because of his age. Defendants' corporate human resources personnel conducted an independent, internal investigation. They came to the conclusion that Ryan was not credible. Bona considered the incident "extremely severe" because of Ryan's physical conduct toward Clements. (Def.'s Mot. Summ. J., Ex. 4, Bona Dep. at 93:5-94:4). Bona and Engstrom also took into consideration his comment to White and his lying during the investigation. They then discussed their findings with Defendants' corporate officials, Reynolds and Messinger, and

14

also O'Kane. Based on these findings, the decision to terminate was made. While Ryan alleges that O'Kane made age-disparaging remarks, he has provided no evidence to show age-related bias by the other individuals involved in the decision, Bona, Engstrom, Reynolds, or Messinger.

Ryan's argument is essentially based on his belief that Defendants' investigation process was conducted poorly on purpose and its outcome was factually incorrect. Ryan, however, "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, prudent, or competent." Fuentes, 32 F.3d at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id.

Ryan has not shown any evidence that Defendants' reasons are "unworthy of credence." Rather, Ryan's evidence only goes to questioning the investigative process and Defendants' decisions about his credibility, the facts in dispute, and the weight of the allegations against him. It is improper for this Court to second-guess that process and those decisions. This Court does

> not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, [the Court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.

Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995). Thus, this Court's inquiry into the factual record finds that Defendants' explanations are honest because they conducted an unbiased investigation, deemed Ryan not credible, and made their decision

accordingly.

With respect to the second prong, Ryan contends that his evidence of age-related comments and incidents show that there was an invidious reason for his termination. He also presents evidence that two allegedly younger WPSG employees, Ross Reardon and Patrick Furlong, were treated less harshly when they were intoxicated and acted inappropriately at a client event. To establish pretext based on the second prong, "the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Logan, 2007 WL 879010, at *7 (citing Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998). Thus, Ryan seems to be arguing that he can satisfy this prong by (1) the alleged past discrimination against him, and (2) the fact that similarly situated persons outside of his protected class were treated more favorably.

The age-related comments and incidents towards Ryan do not show an invidious reason for his termination because they lack a "substantial nexus" to that termination. This is because they all occurred at least a few years prior to the termination and were not directly related to it. Id. at *8 (finding lack of substantial nexus because of significant temporal gap between comments and termination and because comments not directly related to termination). In addition, even though O'Kane was a decisionmaker and made age-related comments in the past, Defendants relied on an independent investigation conducted by Bona and Ensgtrom to make their decision. Id. (stating that "even though [the ultimate decisionmaker] consulted the allegedly discriminatory managers when considering [plaintiff's] termination, he based his final

decision in large part on non-suspect data, namely [a] independent report"). Thus, Ryan cannot make out a circumstantial case based on this evidence because "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Brewer, 72 F.3d at 333; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992); Logan, 2007 WL 879010, at *8.

In addition, Ryan cannot show an invidious reason for his termination based on claiming that Reardon and Furlong were similarly situated persons who were treated less harshly. First, there is no evidence of Reardon's or Furlong's age to determine if they are outside of Ryan's protected class. Second, there is no evidence that the incident they were not punished for was similar to Ryan's. Unlike with Ryan, there is no indication that Reardon's and Furlong's conduct involved a physical assault, lying, or making racially insensitive remarks.

Ryan has failed to put forth evidence to meet either prong of the test to defeat summary judgment on the question of pretext. Therefore, Ryan cannot establish an ADEA claim based on indirect evidence.

### C.   Hostile Work Environment Analysis

"Although the Third Circuit has not specifically held that a hostile work environment claim is available under the ADEA, district courts in this Circuit have assumed the viability of such a claim." Logan, 2007 WL 879010, at *11. To establish a hostile work environment, the plaintiff must show that: "(1) he suffered intentional discrimination on account of his age; (2) the discrimination was 'severe or pervasive'; (3) the discrimination detrimentally affected him; (4) such discrimination would detrimentally affect a reasonable person of the same age in the same

17

position; and 5) a basis for vicarious liability exists." Id.

The evidence Ryan has presented does not rise to the "severe or pervasive" level necessary to establish a hostile work environment.[4]  Factors to be considered in determining whether conduct was severe or pervasive "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at *12 (quoting West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995)).  Moreover, "[a] recurring point in [Supreme Court hostile work environment] opinions is that 'simple teasing,' [citation omitted], offhand comments, and isolated incidents (unless serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

Ryan's evidence of hostile and discriminatory conduct covers various incidents and comments that were explained above.  Most of them, while constituting unprofessional behavior, were merely offensive utterances.  Moreover, many of them, such as the comments at the Ad Club luncheon and the "old girlfriend" comment, were isolated incidents that occurred a few years prior to his termination.  Ryan has presented no evidence of being physically threatened or

---

[4] It is unclear from Ryan's Response to this Motion if he is still pursuing a hostile work environment claim.  In a footnote, he states that he "will not at this juncture pursue his hostile work environment claim." (Ryan's Resp. Mot. Summ. J., 2).  However, later in the footnote, he simply states that he has produced substantial evidence to show a hostile work environment, but because "the relief available to him for his hostile work environment claim is conterminous with the relief available for his age discrimination claim," he "requests that the Court not decide the issue of the viability of his hostile work environment claim (an unnecessary redundancy at this point in the proceeding)." (Id.).  Thus, Ryan has made no arguments as to how the evidence he has presented constitutes a hostile work environment claim.  He just simply asserts that it does, and the Court should not address it at the present time. This Court, however, will address Ryan's hostile work environment claim because Defendants have raised a summary judgment motion on it, and Ryan should have responded to it in kind.

humiliated and no evidence that these incidents unreasonably interfered with work performance. In fact, Ryan remained a successful account executive during this time period. Therefore, Ryan's hostile work environment claim fails to survive summary judgment.

In conclusion, all of Ryan's claims of age discrimination fail to survive summary judgment. Defendants' Motion is granted in full.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| JACK RYAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 06-2385 |
| CBS CORPORATION and PHILADELPHIA TELEVISION STATION WPSG, INC., | : | |
| Defendants. | : | |

**O R D E R**

**AND NOW** this   7th   day of August, 2007, upon consideration of the Motion for Summary Judgment of Defendants CBS Corporation and Philadelphia Television Station WPSG, Inc., and the Response and Reply thereto, it is hereby **ORDERED** that the Defendants' Motion for Summary Judgment (Doc. No. 16) is **GRANTED**.

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY,           Sr. J.